1
2
3
4
5              UNITED STATES DISTRICT COURT
6            SOUTHERN DISTRICT OF CALIFORNIA
7

| | |
|---|---|
| 8  TWINS SPECIAL CO., LTD., a private<br>9  limited company organized under the<br>laws of Thailand,<br><br>10                        Plaintiff,<br><br>11  v.<br>12  TWINS SPECIAL, LLC, NICHOLAS<br>13  MECHLING, an individual,<br>CHRISTOPHER MECHLING, an<br>14  individual, TWINS SPECIAL, an<br>unincorporated general partnership, and<br>15  DOES 1-10, inclusive,<br>16<br>17                        Defendants.<br>18 | Case No.:  23-cv-223-JES-DDL<br>Related Case No.: 21-cv-221-JES-DDL<br><br>**REPORT AND<br>RECOMMENDATION FOR ORDER<br>(1) GRANTING PLAINTIFF'S<br>MOTION FOR TERMINATING<br>SANCTIONS, (2) GRANTING IN<br>PART PLAINTIFF'S MOTION FOR<br>MONETARY SANCTIONS,<br>(3) DENYING PLAINTIFF'S<br>MOTION FOR SANCTIONS<br>AGAINST COUNSEL AND<br>(4) DENYING PLAINTIFF'S<br>MOTION FOR CONTEMPT<br>FINDINGS**<br><br>**[Dkt. Nos. 249, 288, 322]** |

19
20
21

**I.**

**INTRODUCTION**

Plaintiff Twins Special Co., Ltd. ("Plaintiff" or "Twins Thailand") moves for sanctions and contempt findings arising from Defendants' discovery misconduct.  Dkt. Nos. 249, 288, 322.  Specifically, Plaintiff moves for terminating sanctions and monetary sanctions against defendants Twins Special, LLC; Nicholas Mechling and Christopher Mechling (collectively "Defendants"); findings of civil and criminal contempt against Defendants; and sanctions against Defendants' counsel under 28 U.S.C. § 1927.  *Id.*

1

The Court has carefully considered the moving papers, the parties' supplemental briefs, the arguments of counsel, and the testimony given by Nicholas Mechling, Christopher Mechling, and the forensic examiner at the evidentiary hearing in this matter. As explained below, the present record supports findings that Defendants disobeyed court orders by failing to produce documents responsive to Plaintiff's discovery requests, wiping their iPhones and selectively deleting files from other devices after being ordered to produce the devices for a forensic examination, and providing other devices to an unnamed third party in Thailand rather than the forensic examiner. The record further establishes that Defendants' discovery misconduct prejudiced Plaintiff and that terminating sanctions are warranted under Federal Rules of Civil Procedure 37(b) and 37(e) and the Court's inherent authority. The record further supports imposition of monetary sanctions in the form of attorneys' fees and costs against Defendants under Rule 37(b)(2)(C), although not in the amount sought by Plaintiff.

The undersigned thus respectfully submits this Report and Recommendation to United States District Judge James E. Simmons, Jr. pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.1(c), **RECOMMENDING** that Plaintiff's motion for terminating sanctions be **GRANTED** and that Plaintiff's motion for monetary sanctions be **GRANTED IN PART**. The undersigned further recommends that Plaintiff's motion for contempt findings be **DENIED AS MOOT** and that Plaintiff's motion for sanctions against defense counsel be **DENIED**.

## II.

## FACTUAL AND PROCEDURAL HISTORY

### A.    Complaint Allegations

Plaintiff Twins Thailand, a boxing and martial arts company based in Thailand, alleges it entered into agreements with Defendants in 2010 and 2013 to expand the sales of Plaintiff's products into the United States. Dkt. No. 78 ("Second Am. Comp.") ¶¶ 2, 18-19. Under the agreements, Plaintiff would sell goods to Defendants for resale in the United States. Id. ¶¶ 20-21, 101-03.

Beginning in June 2010, Plaintiff sold goods bearing their trademarks and copyrighted designs to Defendants for resale in the United States. Second Am. Comp. ¶ 20. Plaintiff alleges that, beginning in 2020, Defendants refused to pay for goods and wrongfully laid claim to the copyright in Plaintiff's designs. Id. ¶¶ 21-23. Plaintiff therefore stopped selling its goods to Defendants. *Id.* ¶¶ 20-28. But in 2022, Plaintiff discovered Defendants were still selling boxing gloves and equipment bearing Plaintiff's trademarks and copyrighted designs. *Id.* ¶¶ 24-33. Plaintiff alleges Defendants were "acquiring goods bearing the Marks not from Plaintiff, bur rather from a third party manufacturer" and "selling those goods to consumers." *Id.* ¶¶ 24-25. Those sales were made, at least partially, via a number of websites owned by Defendants. *Id.* ¶¶ 24, 28. Defendants "added a marking to the gloves being sold on the aforementioned websites . . . that further served to confuse consumers into believing that the products being sold on the websites actually originated with Plaintiff when in fact they did not." *Id.* ¶ 30.

Plaintiff's Second Amended Complaint alleges the following causes of action: copyright infringement; false designation of origin; cancellation of registrations; unfair competition; breach of contract; and rescission. *Id.* ¶¶ 34-117. Significantly, Plaintiff alleges "Defendants utilize false designations of origin, false and misleading descriptions of fact related to the source of the goods being sold and their association with the Plaintiff and other symbols which draw a false connection between Plaintiff and Defendants' products." *Id.* ¶ 44.

## B.    Discovery Proceedings

Between October 2023 and the present, the undersigned has presided over multiple discovery conferences and motion hearings pertaining to Defendants' compliance with their discovery obligations. A summary of the relevant proceedings follows:

### 1.    November 20, 2023 Discovery Conference

On November 20, 2023, the Court held a discovery conference regarding Defendants' privilege log and responses to Plaintiff's requests for production ("RFPs"). Dkt. No. 129. The Court ordered Defendants to (1) serve amended responses to Plaintiff's

RFPs, (2) produce all non-privileged documents responsive to Plaintiff's RFPs, and (3) provide a privilege log. *Id.*

### 2. **January 9, 2024 Discovery Conference**

The Court held a further discovery conference on January 9, 2024 regarding disputed discovery requests and Defendants' privilege log. Dkt. No. 136. After the conference, the Court issued a briefing schedule and set a discovery hearing for February 8, 2024. Dkt. No. 139. Plaintiff moved to compel further deposition testimony under Federal Rule of Civil Procedure 30(b)(6) and further production of certain communications between Defendants and their sublicensees that Plaintiff asserted were responsive to RFPs. Dkt. No. 147. Defendants opposed the motion. Dkt. No. 148. Based on the briefing and hearing, the Court denied the motion to compel further deposition testimony, but granted the motion to compel further production of documents "as to all of Plaintiff's Requests for Production at issue to the extent Defendants did not produce all responsive, nonprivileged documents pertaining to Avalanche Company LLC [one of Defendants' sublicensees]." Dkt. No. 152 at 2-3.

### 3. **July 16, 2024 Hearing and Order**

Three months later, Plaintiff moved for sanctions against Defendants based on alleged noncompliance with the Court's order to produce these additional responsive documents. Dkt. No. 193. Defendants opposed the motion. Dkt. No. 210. Upon considering the briefing and oral argument on July 16, 2024, the Court ordered: (1) Defendants to produce all documents responsive to Plaintiff's RFPs, including but not limited to communications with all sublicensees, (2) Plaintiff to provide Defendants with a list of email addresses to assist Defendants' search for responsive documents, (3) Plaintiff could reopen the deposition of Defendant Twins USA under Rule 30(b)(6), and (4) Plaintiff could take the individual depositions of Nicholas and Christopher Mechling regarding their efforts to comply with their discovery obligations. Dkt. No. 216 at 2. Finally, the Court ordered the parties to file a joint status report as to their compliance with the July 16 order. *Id.*

The parties timely filed their joint status report. Dkt. No. 228. Plaintiff reported that Defendants' responsive production consisted only of an unsigned proposal from 2013 and 22 pages of photos of Twins Thailand facilities from 2010. Dkt. No. 228-1. Plaintiff reported that Defendants did not produce any communications with, or financial information for, Defendants' sublicensees. *Id.* Defendants reported that both Mechlings had been deposed on July 26 and August 1, and that Christopher Mechling had been deposed again on August 5. Dkt. No. 228-2. Furthermore, Defendants reported, a supplemental production of responsive documents occurred on July 26, 2024. *Id.* Defendants also reported that the Mechlings underwent a diligent search for further documents, but that they found no documents that they had not already produced. *Id.* at 2.

### 4. <u>August 16, 2024 Status Conference</u>

Because of these dueling status reports, the Court set a status conference for August 16, 2024. Dkt. Nos. 229, 230. After the status conference, the Court ordered the parties to meet and confer regarding the protocol for a forensic examination of Defendants' electronic devices and cloud-based accounts. Dkt. No. 231. By not later than August 30, the parties were to file a status report proposing an inspection protocol and timeline. *Id.* The parties timely complied, and the Court held a further status conference to discuss the proposed protocol. Dkt. Nos. 234-36. On September 4, 2024, the Court adopted the parties' proposed protocol for forensic examination in the form it takes at Dkt. No. 239 ("Forensic Examination Order").

The Forensic Examination Order required, in relevant part: (1) the examination shall be conducted by an independent forensic examiner authorized by the Court, with Plaintiff to select and pay the examiner while reserving the right to seek an order shifting cost to Defendants; (2) the examiner shall "search for and locate documents relevant to this proceeding that have not been previously produced;"(3) all parties shall "cooperate promptly and fully with the examiner, including by promptly meeting the examiner (or his agents) for device turnover at locations reasonably close to the devices' locations, and promptly supplying information, passwords, and credentials required to access and decrypt

23-cv-223-JES-DDL

data;" (4) the examiner shall send Defendants a Disclosure form requiring Defendants to "identify all relevant devices and accounts in their possession, custody or control and their physical locations" and "provide passwords and other necessary information to access data;" and (5) the examiner shall "conduct the analysis authorized by the Court following professional norms and his professional judgment." Dkt. No. 239 at 2-5.

### 5.    September 20, 2024 Discovery Conference

The Court issued its Forensic Examination Order on September 4, 2024. Although the Order required the Mechlings to cooperate "fully and promptly" with the examiner, the forensic examination did not begin until September 30, 2024, when the Court ordered Nicholas and Christopher Mechling to appear in San Diego in person to turn over their electronic devices to the examiner. Dkt. No. 239. To be sure, Plaintiff was responsible for a week's delay by firing the original forensic examiner. *See* Dkt. No. 259-1 ¶ 3 ("Morris Decl. Sept. 29, 2024") (Plaintiff fired the first forensic firm because that firm did not provide a disclosure form to Defendants or propose device turnover locations and times). But declarations and testimony demonstrate the Mechlings did not cooperate fully and promptly with the examiner from September 10 onward.

On September 10, the examiner sent the Mechlings a disclosure form to begin the forensic examination. *Id.* ¶ 5. The Mechlings did not respond with answers to the disclosure form. *Id.* ¶¶ 6-7. Instead, they noted the new disclosure form was a complex 15-page document requesting much more information than they had anticipated, and that the level of detail requested raised some serious safety and privacy concerns related to their location data. *Id.*; Dec. 11 Hearing Trans. at 38:8-12. Over the next six days, counsel for both parties exchanged multiple emails and met and conferred to figure out a solution. *Id.* ¶ 7; Dkt. No. 249 ("Contempt Mot.") at 2-3.

Counsel eventually agreed that the Mechlings would go over the information requested by the disclosure form with the forensic examiner over the phone. Morris. Decl. Sept. 29, 2024 ¶ 7; Contempt Mot. at 3. The examiner emailed the Mechlings and proposed four times for a phone call. Contempt Mot. at 4; Dec. 10 Hearing Trans. at 17:12-19. The

Mechlings did not respond to that email, so the examiner scheduled four calls via Microsoft Teams and provided login information for each. Contempt Mot. at 4. The Mechlings joined a call with the examiner on September 19, but did not provide information to the examiner, stating they needed answers to questions they had about the disclosure form; the examiner and the Mechlings agreed to try again the next day. Contempt Mot. at 4; Dec. 10 Hearing Trans. at 18:2-11**.** The next day, they got on another call, but the outcome was the same. Contempt Mot. at 4-5; Dec. 10 Hearing Trans. at 13:23-14:4 (Mr. Bhandari: "Did the defendants ever . . . complete this form for you?" Mr. Thankachan: "No, I have never seen a completed . . . signed version of this disclosure form.").

On September 20, 2024, the Court held a discovery conference wherein Plaintiff asserted the Mechlings had not met their obligations under the Forensic Examination Order. Dkt. No. 247. The Court set a further in-person hearing on September 30, 2024, requiring the Mechlings, the examiner, and counsel for both parties to appear in person, and for the Mechlings to bring all electronic devices at issue with them. *Id.* at 2. In an effort to avoid unnecessary travel by the Mechlings to San Diego for an in-person hearing, the Court stated that it would vacate the September 30 status conference if the Mechlings fulfilled their obligations the Forensic Examination Order by not later than September 26, 2024.

After the September 20 discovery conference, the examiner explained that he needed all forms to be completed and returned by September 23, and all devices turned over by September 24, so that he could meet the deadlines for compliance set by the Court. Dkt. No. 255 at 3-4 (Joint Status Report); Dec. 10 Hearing Trans. at 20:11-24. On September 24, the Mechlings emailed the examiner with questions about the disclosure form and confirmed they would speak with him on September 26. Dkt. No. 255 at 4. The Mechlings did not attend that call, later informing the examiner they had conflicts due to their father's medical care. Dkt. No. 255 at 4; Dec. 11 Hearing Trans. at 22:16-19. On September 26, the Mechlings told the examiner that the devices were ready for pickup any time in the next five hours, and that they would make themselves available if that time

window did not work.  Dkt. No. 255 at 4, 6; Dec. 10 Hearing Trans. at 23:10-24:16. Ultimately, the devices were not turned over to the examiner on September 26, and the September 30 in-person hearing proceeded as scheduled.

Christopher Mechling elected not to attend the September 30 hearing in person—without providing any notice to the Court—to tend to his father's medical care.  At the September 30 hearing, the Court ordered Nicholas Mechling and Defense counsel to "personally attend the forensic examination at Plaintiff's counsel's law office and to comply fully with" the Forensic Examination Order.  Dkt. No. 257.

The next week, the parties filed a status report regarding compliance with the Forensic Examination Order.  Dkt. No. 266.  Plaintiff reported that immediately following the September 30 hearing, Nicholas Mechling turned over two Apple iPhones and two Apple computers, and provided login information for two Gmail accounts and two linked iCloud accounts.  *Id.* at 2-3.  The devices were imaged by the forensic team and returned later that same day.  *Id.*  Plaintiff reported further that although Nicholas Mechling agreed to promptly forward the information requested by the examiner over email shortly after the in-person examination, he did not do so for several days.  *Id.* at 3.

On October 1, 2024, the day after the in-person examination, Defense counsel disclosed to Plaintiff's counsel that "there may be additional documents not previously produced by my clients which may be responsive to your client's discovery requests."  *Id.* at 4.  The "nature, size, locations, and causes" of this withheld data remained uncertain to Plaintiffs as of the date of the status report, but defense counsel admitted these "documents include[d] spreadsheets which refer to both [the Mechlings'] individual finances and the finances of Twins Special, LLC."  *Id.*

Defendants reported that Nicholas Mechling cooperated fully with the examiner on September 30, the hard drive off each device was copied successfully, and the required passwords were timely provided.  *Id.* at 5.  Defendants also reported that Nicholas Mechling provided all data further requested by the examiner, and that any delay was caused by the time commitment of returning to Thailand.  *Id.* at 5-6.

23-cv-223-JES-DDL

Once the examiner had access to the Mechlings' devices, and in line with the procedures of the forensic examination order, he "released about 260,000 documents for defense counsel's review" and "identified at least tens of thousands of relevant documents that should have been produced earlier."[1] Dkt. No. 288-2 ¶ 3(a) ("Thankachan Decl. Nov. 4, 2024").

### 6.    September 30, 2024 and October 15, 2024 Hearings

Plaintiff subsequently moved to find Defendants in contempt for violating the forensic examination order. Contempt Mot. Defendants opposed the motion. Dkt. No. 259 ("Contempt Opp'n"). After holding hearings on September 30 and October 15 and reviewing the briefing and joint status report described above, the Court issued an order on October 16, 2024 setting an evidentiary hearing and clarifying, at the parties' requests, the scope of the forensic examination order. Dkt. No. 277. Specifically, the Court ordered that the examiner shall provide to the parties "any documents, evidence or data the examiner locates that demonstrate or are relevant to the claim that the Defendants did not previously comply with Court orders, including evidence demonstrating the destruction, concealment, removal or deletion of data prior to production to the examiner." *Id.* at 2-3.

### 7.    December 10, 2024 Evidentiary Hearing

Plaintiff filed a motion for sanctions on November 4, 2024; that sanctions motion subsumed the sanctions motion filed previously in May 2024. Dkt. No. 288 ("Sanctions Mot."). Defendants opposed the motion. Dkt. No. 295 ("Sanctions Opp'n"). The Court held an evidentiary hearing on December 10, 2024. At the evidentiary hearing, Plaintiff called Danny Thankachan and Jerry Bui, members of the forensic examination team, as witnesses. Dkt. No. 303 at 3; *see generally* Dkt. No. 330 ("Dec. 10 Hearing Trans.").

---

[1]    At the time of this declaration, Mr. Thankachan wrote "Defendants' obstruction of the forensic inspection creates serious evidentiary gaps that do not permit me to definitively state the full impact of Defendants' apparent noncompliance," and that "[a]ll conclusions . . . are therefore tentative in the sense that the true facts will likely be even worse for Defendants." Thankachan Decl. Nov. 4, 2024 ¶ 3(a).

Defendants called Christopher and Nicholas Mechling as witnesses. *Id.* On December 11, the Court heard oral arguments from counsel for both parties. *See generally* Dkt. No. 317 ("Dec. 11 Hearing Trans.").

The examiner testified that he was "able to reach forensically sound conclusions on numerous integrity problems with Defendants' purported cooperation with the Court's orders, including the existence of multiple devices Defendants still refuse to provide, and Defendants' wiping of devices they did provide." Thankachan Decl. Nov. 4, 2024 ¶ 3(a). These conclusions were: "Defendants failed to provide massive amounts of relevant documents in discovery;" on September 14 and 24, Defendants wiped two iPhones that they later provided for inspection at the September 30 hearing; Defendants "withheld (and continue to withhold) relevant data from the September 30 forensic inspection;" and "Defendants withheld (and continue to withhold) devices containing relevant data." *Id.* ¶ 4. The Court discusses the evidence underpinning each of these conclusions below.

### a. <u>Failure to provide relevant documents in discovery</u>

Before the forensic examination, Defendants had produced 5,414 documents in discovery. *Id.* Once the examination team had access to the four devices turned over by Defendants, it searched the devices using the stipulated search terms from the Forensic Examination Order. *Id.* The team identified, in email alone, about 300,000 documents that were potentially responsive to Plaintiff's requests for production. *Id.* The team further found about 100,000 non-email messages (texts or Facebook messages) on Defendants' devices that were never produced, and "many of those messages should have been produced." *Id.* Thousands of these documents contained information relating to Defendants' financial information and to sublicensees,[2] which the Court had previously—

---

[2] Dkt. No. 273-1 at 2-3 ("initial searching easily shows well over one thousand Gmail communications with the individual Defendants identified as their contacts at sub-licensees Fighting Spirit and Plumtree" and "hundreds of communications with an individual named Cocores, who . . . Defendants identified as their main contact at sub-licensee Fighting Spirit").

and repeatedly—ordered to be produced. *See* Dkt. No. 129 ("Defendants shall serve all non-privileged documents responsive to Plaintiff's RFPs that are in Defendants' possession, control or custody"); Dkt. No. 152 (Defendants shall produce "all responsive, nonprivileged documents, including but not limited to documents pertaining to Avalanche Company LLC"); Dkt. No. 216 (Defendants "must produce all documents responsive to Plaintiff's requests for production . . . includ[ing] . . . communications involving sub-licensees and all financial data for sales involving products with the TWINS SPECIAL, KING and KING PROFESSIONAL marks").

For example, Plaintiff's Exhibit 28 contained financial records for Fighting Spirit, LLC and Avalanche Company, LLC, two of Defendants' sublicensees. Dec. 10 Hearing Trans 117:20-119:7. These documents were not produced by Defendants, despite court orders to produce documents "pertaining to Avalanche Company LLC," all communications with sublicensees (such as Fighting Spirit) and all financial data for sales involving the marks at issue. Dkt. Nos. 152, 216. As another example, Exhibit 29 shows emails from "Nick & Chris[nc@twinsfightgear.com]," admittedly the Mechlings' own email address, providing information to Nevada LLC Services regarding the Doing Business As ("DBA") information for Plumtree, LLC and Fighting Spirit, LLC. Dec. 10 Hearing Trans. at 123:7-124:9. Exhibit 29 also shows emails to the Mechlings containing invoices and payment confirmations for the DBAs of Plumtree and Fighting Spirit, and for the formation of Coconut, LLC, one of Defendants' sourcing agents. *Id.* 124:15-125:20. Exhibits 30 (postal service application for one of Defendants' sourcing agents signed by Nicholas Mechling), 31 (service agreement for one of Defendants' sourcing agents signed by Nicholas Mechling), 32 (assignment of membership interest in one of Defendants' sublicensees), and 35 (email regarding virtual office accounts for two of Defendants' sublicensees and one of Defendants' sourcing agents sent to Nicholas Mechling) show similar communications. *See id.* at 126:1-130:15. These documents were not produced by Defendants, despite court orders to produce "communications involving sublicensees." Dkt. No. 216.

23-cv-223-JES-DDL

### b.    Wiping devices before the forensic examination

The examiner found "evidence that the iPhones Defendant Nick Mechling provided on September 30, 2024 as Defendants' current mobile phones may have been dummy devices, or otherwise altered shortly before the examination." Thankachan Decl. Nov. 4, 2024 ¶ 4(b).  Specifically, on September 14 and 24, 2024— shortly after the Court issued its Forensic Examination Order requiring the Mechlings to turn over their devices to the examiner—the iPhones "were wiped in their entirety and then . . . restored from a backup." Dec. 10 Hearing Trans. at 30:12-31.  The effect of "wiping" a device is to remove all data from the device and then replace it with data that the user elects to place on the reset device. Thankachan Decl. Nov. 4, 2024 ¶ 4(b).  The forensic data also showed that Nicholas Mechling's "representations to the forensic team about how long those mobile devices were in use by him and his brother . . . were false and/or misleading." Dec. 10 Hearing Trans. at 30:12-31.  The examiner asked the Mechlings why the data showed their phones had been reset, but the Mechlings never responded to the inquiry.  *Id.*; Dec. 10 Hearing Trans. at 31:13-17 (Mr. Bhandari: "So they refused to talk to you about the known wiping of their iPhones?" Mr. Thankachan: "Correct." Mr. Bhandari: "Through today?" Mr. Thankachan: "Yes.").

### c.    Deleting and withholding relevant data

On October 1, 2024, counsel for Defendants sent a letter to counsel for Plaintiff disclosing that "certain files were apparently deleted from the devices produced on September 30, 2024, to protect, in their minds, the Mechlings' individual rights of privacy." Dkt. No. 266-1.  The letter continued that these data "include spreadsheets which refer both to [the Mechlings'] individual finances and the finances of Twins Special LLC." *Id.*  The Mechlings uploaded about 31,000 deleted documents to the upload link provided by the examiner, but Defendants have not confirmed they have completed the upload of all deleted documents, "despite repeated requests" on October 21, 26, and 30.  Thankachan Decl. Nov. 4, 2024 ¶ 4(c); Dec. 10 Hearing Trans. at 26:1-27:20 (Mr. Bhandari: "Have the Mechlings ever . . . confirm[ed] that that set of data that you made available to them is, in fact, the full

universe of data that they intentionally deleted from the devices provided for inspection?" Mr. Thankachan: "They have not.").   Despite this lack of confirmation, the examiner has concluded "that the Mechlings likely continue to withhold documents . . . that the docket of this case indicates that the Mechlings created . . . and/or relevant documents that other data indicates they possessed (e.g., financial data such as [QuickBooks] files)." *Id.*

Furthermore, the forensic team "found evidence that Defendants used Signal (an encrypted communication application)," though it is "impossible to say how much evidence was hidden through encrypted communications, or the significance of that evidence." *Id.* at 8-9.  What is clear is that Defendants explicitly told Jerry Bui during a September 30, 2024 interview that they did not use encrypted channels to communicate, but that the forensic examination revealed "iMessages that specifically reference shifting certain discussions from unencrypted iMessages to Signal." *Id.* ¶ 6(a); *see also* Dec. 10 Hearing Trans. at 74:3-75:17 (Jerry Bui: "[T]here were normal text messages that . . . explicitly said 'Let's take this conversation offline on Signal.'").

### d.   Withholding devices containing relevant data

The examiner also concluded that the Mechlings "continue to withhold at least one device containing relevant data," and "may have withheld multiple devices from the forensic examination." *Id.* ¶ 4(d).  The withheld data discussed above "is being uploaded from a computing device that by definition was withheld from examination." *Id.*  And Defendants have also declined to respond to examiner requests to confirm whether they had any additional devices that may contain responsive material.  *Id.*; *see also* Dec. 11, 2024 Trans. at 24:24-35:6 (The Court: "What device . . . was this data uploaded from?" Attorney Morris: "I don't know the answer to that question, your Honor." The Court: "Is this the device that should have been provided to the forensic examiner, if it contained all this responsive data?" Attorney Morris: "I don't know.").

Furthermore, while on the stand at the evidentiary hearing on December 10, Nicholas Mechling testified Defendants had unilaterally decided to give several hard drives of data to an unnamed, "wholly independent" third party vendor in Thailand, rather than give these

drives to the forensic examiner.  Dec. 10 Hearing Trans. at 114:23-115:3, 137:13-139:8.  At oral argument the next day, the Court confirmed that this was the first time Defendants had revealed this information; they had not previously shared this information with Plaintiff, the examiner, or, it appears, with their own counsel.  Dec. 11, 2024 Trans. at 42:5-12 (The Court: "So the Mechlings deleted documents showing their financial information from the devices produced on September 30th.  Are those the same or a subset of the documents that Nicholas Mechling testified yesterday were transferred by himself to this unnamed forensic examiner in Thailand?" Mr. Morris: "I don't know.").

### III.

### LEGAL STANDARDS

**A.    Rule 37(b)**

Rule 37(b) "authorizes the district court, in its discretion, to impose a wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules."  *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983).  Under Rule 37(b)(2)(A), "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders" which "may include . . . (iii) striking pleadings in whole or in part; . . . (v) dismissing the action; . . . or (vii) rendering default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(iii), (v)-(vii).  A finding that a discovery order has been violated "is entitled to considerable weight" because the presiding judge is "best equipped to assess the circumstances of non-compliance."  *Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir. 1997).

**B.    Inherent Authority**

The Court has the inherent authority to impose terminating sanctions when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings."  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)); s*ee also Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th

Cir. 2007) (terminating sanctions are warranted when "a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts"). "It is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders." *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982).

Under both Rule 37(b) and the Court's inherent authority, terminating sanctions should be imposed only in circumstances "where the violation is due to willfulness, bad faith, or fault of the party," *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996), and where "the misconduct penalized [relates] to matters in controversy in such a way as to interfere with the rightful decision of the case." *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 381 (9th Cir. 1988). Under both authorities, courts must also weigh the following five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69 F.3d at 348; *see Leon*, 464 F.3d at 958 n.4 ("Although this five-factor test is usually used to review the propriety of Rule 37 sanctions, this same test was applied in *Anheuser-Busch* to review sanctions granted under a court's inherent power."). In most cases, the first two factors weigh in favor of the imposition of sanctions, and the fourth factor weighs against a terminating sanction. *Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang*, 105 F.3d 521, 524 (9th Cir. 1997). "Thus the key factors are prejudice and availability of lesser sanctions." *Id.*; *see also Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998) (when considering terminating sanctions, factors three and five "are decisive").

## C. **Rule 37(e)**

Rule 37(e) applies "when discovery issues arise regarding spoliation of electronically stored information." *Elite Semiconductor, Inc. v. Anchor Semiconductor, Inc.*, No. 5:20-CV-06846-EJD, 2024 WL 5058527, at *3 (N.D. Cal. Dec. 9, 2024). A party

engages in sanctionable misconduct triggering Rule 37(e) when it (1) "fail[s] to take reasonable steps to preserve" electronically stored information ("ESI") that (2) "should have been preserved in anticipation or conduct of litigation," and (3) when such information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). "Once a court is satisfied a party has engaged in this misconduct, it conducts a two-tiered analysis to determine the appropriate sanction." *Elite Semiconductor*, 2024 WL 5058527, at *3. The most severe sanctions—adverse inferences and terminating sanctions—are available only if the court finds "that the party acted with the intent to deprive another party of the [lost] information's use in the litigation." Fed. R. Civ. P. 37(e)(2). "The Ninth Circuit has not set forth a specific standard of proof, but district courts in this Circuit apply a preponderance of the evidence standard in making findings to determine whether to impose spoliation sanctions under Rule 37(e)." *Morehead v. City of Oxnard*, No. CV 2:21-cv-07689-SPG-ADSX, 2023 WL 8143973, at *4 (C.D. Cal. Oct. 4, 2023) (collecting cases). "On considering a motion for sanctions, a district court may make factual findings and assess the credibility of witnesses." *WeRide Corp. v. Kun Huang*, No. 5:18-CV-07233-EJD, 2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020).

## IV.

## ANALYSIS

Plaintiff seeks an order imposing terminating sanctions against Defendants for their discovery misconduct, which Plaintiff identifies as (1) withholding relevant data from discovery and from the forensic examiner; (2) spoliating data on the Mechlings' cell phones and other devices; (3) failing to comply with the undersigned's orders issued on November 20, 2023 (Dkt. No. 129), February 9, 2024 (Dkt. No. 152), July 16, 2024 (Dkt. No. 216), September 4, 2024 (Dkt. No. 239), September 20, 2024 (Dkt. No. 247), and September 27, 2024 (Dkt. No. 256);  and (4) falsely certifying the completeness of

discovery productions and compliance with Court orders.[3]  Sanctions Mot. at 1-6; Dkt. No. 321 at 5-6 ("Post-Hearing Sanctions Mot.").

The Court finds terminating sanctions appropriate under Rule 37(b) and the Court's inherent authority because the five factors set forth in *Anheuser-Busch* weigh in favor of terminating sanctions and because Defendants' misconduct was willful and related to the merits of the case as required by Ninth Circuit precedent. *Exxon Valdez*, 102 F.3d at 432; *Halaco Eng'g*, 843 F.2d at 381.  The Court also finds "the Rule 37(e) prerequisites are met, the spoliating party acted with the intent required, . . . and lesser sanctions are insufficient" such that terminating sanctions under Rule 37(e) are appropriate.  *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024).

## A.  Terminating Sanctions under Rule 37(b) and the Court's Inherent Authority

Terminating sanctions are warranted under both Rule 37(b) and the Court's inherent authority where (1) "the violation is due to willfulness, bad faith, or fault of the party," *Exxon Valdez*, 102 F.3d at 432, (2) "the misconduct penalized [relates] to matters in controversy in such a way as to interfere with the rightful decision of the case," *Costle*, 843 F.2d at 381, and (3) the five factors set forth in *Anheuser-Busch* weigh in favor of terminating sanctions.  69 F.3d at 348.

### 1.  Willfulness

"A finding of willfulness, fault, or bad faith is required for dismissal to be proper." *Leon*, 464 F.3d at 958.  "The willfulness standard is met by disobedient conduct that is within the offending party's control."  *Garrison v. Ringgold*, No. 19-CV-0244 GPC-DEB, 2020 WL 6537389, at *4 (S.D. Cal. Nov. 6, 2020) (citing *Stars' Desert Inn*, 105 F.3d at 525).

---

[3]     Plaintiff also contends that terminating sanctions are appropriate because Defendants lied at depositions and evidentiary hearings about their control over sublicensees, Post Hearing Sanctions Mot. at 10, and because they falsified evidence by backdating assignment agreements.  *Id.* at 13.  The Court makes no findings as to these contentions and did not consider them in deciding to recommend terminating sanctions.

Defendants acted willfully by disregarding court orders to produce information in discovery. Tellingly, at oral argument on December 11, 2024, the undersigned told defense counsel he was "having a very difficult time coming to any conclusion other than your clients did not obey court orders." Dec. 11, 2024 Trans. at 32:10-15. Counsel responded he "would not make the argument that they did." *Id.* The evidence compels this conclusion. Before the forensic examination, Defendants had provided only 5,414 documents in discovery. Thankachan Decl. Nov. 4, 2024 ¶ 4. The forensic examination revealed about 300,000 emails and 100,000 non-email messages that were never produced. *Id.* Defendants argue that because Plaintiff admitted into evidence only 13 of these documents at the December 10 hearing, then these are the only documents that should have been produced by Defendants. Dkt. No. 320 at 6 ("Post-Hearing Sanctions Opp'n."). The argument strains credulity. Tens of thousands of these uncovered documents contained information relating to Defendants' financial information and to sublicensees, which the Court had previously and repeatedly ordered to be produced. Dkt. No 273-1 ¶ 4 ("Thankachan Decl. Oct. 14, 2024"); *see supra* Section III-vii-1.

Defendants also argue that "there is no reliable evidence that any other responsive documents exist which have not been produced" because no licensed attorney offered evidence on the issue of relevance. Post-Hearing Sanctions Opp'n at 6. First, even putting aside the issue that Defendants point the Court to no legal authority imposing this requirement on Plaintiff, the examiner graduated from law school and has spent over 20 years in the field of legal technology. Dkt. No. 321-2 ¶ 2 ("Thankachan Decl. Jan. 31, 2025"). He has "managed thousands of discovery productions and reviews, including as Director of E-Discovery at multiple major U.S. law firm[s] (three AmLaw 100 firms)." Thankachan Decl. Jan. 31, 2025 ¶ 2; *see also* Dec. 10 Hearing Trans. at 9:2-11:10 (explaining credentials and experience). Based on his experience conducting hundreds of similar reviews, the examiner identified "at least tens of thousands of relevant documents that should have been produced earlier." Thankachan Decl. Nov. 4 ¶ 3(a). Second, even assuming the 13 documents entered into evidence were the *only* relevant responsive

documents Defendants failed to produce, that would mean Defendants failed to produce 13 documents that plainly fall within the scope of what they had been ordered to produce by the Court at least three separate times. *See* Dkt. Nos. 129, 152, 216. This alone would satisfy the willfulness requirement; when coupled with Defendants' other discovery misconduct described above, *see supra* Section III-vii, and spoliation described below, *see infra* Section V-B, a willfulness finding is inescapable.

Finally, Defendants argue their nonproduction of these documents was not willful, but the inadvertent result of being just two people trying their best to search through caches of documents. Dec. 10 Hearing Trans. at 120:20-121:1; Sanctions Opp'n at 4. They argue all the newly discovered documents could only have been produced because of the examiner's technological sophistication, increased manpower, and use of artificial intelligence. *Id.* To the extent Defendants mean to argue the misconduct was outside their control such as to defeat the willfulness inquiry, the Court disagrees. Any diligent search by the Defendants to comply with the Court's discovery orders would have turned up these documents.

For example, Plaintiff's Exhibit 28 contained financial records for Fighting Spirit, LLC and Avalanche Company, LLC, two of Defendants' sublicensees. Dec. 10 Hearing Trans. at 117:20-119:7. These are the titles of some of those financial records: "Avalanche Company, LLC profit and loss statement;" "Fighting Spirit LLC Projected Profit and Loss Statement;" and "Fighting Spirit, LLC Projected Asset Costs (Balance Sheet Items)." These documents were not produced by Defendants, despite court orders to produce documents "pertaining to Avalanche Company LLC," and financial data "involving sublicensees [such as Fighting Spirit]." Dkt. Nos. 152, 216. And as discussed above, Exhibits 29, 30, 31, 32, and 35 show other communications are responsive to Plaintiff's RFPs, and that were ordered to be produced by the Court multiple times during this litigation. Dec. 10 Hearing Trans. at 123:7-130:15 (describing the contents of the documents); Dkt. Nos. 152, 216 (Court orders to produce "communications" and "financial data involving sublicensees"). That these documents were produced only through the

forensic examination demonstrates either that the Mechlings did not perform a diligent search, or that they withheld these documents from the examiner.  Either way, their misconduct was willful.

### 2.    **Relatedness to the Merits**

In addition to being willful, the misconduct "must relate to matters in controversy in such a way as to interfere with the rightful decision of the case. . . . There must be a nexus between the party's actionable conduct and the merits of his case." *Halaco Eng'g*, 843 F.2d 376; *cf. Phoceene Sous-Marine*, 682 F.2d at 805-06 (entry of default improper where defendant deliberately deceived court not about merits of controversy, but about peripheral matter of his availability for trial).

Defendants' discovery misconduct relates to non-production and deletion of documents containing information about Defendants' financial information and communications with sublicensees.  These issues are not peripheral.  Rather, they go to underlying questions in this case: how did the goods containing allegedly infringing marks make their way to Defendants, and how did Defendants sell those goods to consumers? For example, Plaintiff alleges that, beginning in 2022, every product sold by Defendants bearing Plaintiff's marks was manufactured by an entity or entities other than Plaintiff, and that the Mechlings sold these products through a series of sublicensees, the operations over which the Mechlings "have the ability and obligation to oversee."  Second. Am. Comp. ¶¶ 24-29.  And although the Court does not make a finding that Defendants lied at depositions regarding sublicensees (*supra* Footnote 3), transcripts of depositions and hearings spanning from October 2022 through August 2024 further make clear that the Mechlings' level of involvement in, and control over, their sublicensees' operations are directly related to the merits of this case.  *See* Dkt. No. 288-3 at 16-29 (deposition and hearing transcripts).

/ / /

/ / /

/ / /

### 3.    Five Factor Test

In deciding whether to issue terminating sanctions, courts must consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69 F.3d at 348.  All but the fourth factor support the imposition of terminating sanctions, and the "decisive" third and fifth factors weigh heavily in favor of dismissal.  *Valley Eng'rs*, 158 F.3d at 1057.

#### a.    Expeditious resolution of litigation

The first factor, the public's interest in expeditious resolution of litigation, weighs in favor of terminating sanctions.  Defendants' refusal to timely and willingly comply with their discovery obligations has delayed resolution of this case.  This case was filed in March 2022 and transferred to this District in February 2023.  Since then, "much of the litigation time has been spent dealing with [Defendants'] refusal to shoulder [their] discovery obligations." *Hollis v. Bal*, No. 2:13-CV-02145-MCE-JDP (PC), 2024 WL 3446543, at *2 (E.D. Cal. July 17, 2024).

#### b.    Court's need to manage its docket

For much the same reason, the second factor also weighs in favor of terminating sanctions.  "It is incumbent upon the Court to manage its docket without being subject to routine noncompliance of litigants . . . ." *Pagtalunan v. Galaza*, 291 F.3d 639, 642 (9th Cir. 2002).  Defendants have a history of failing to comply with their discovery obligations. Since November 20, 2023, the undersigned has held ten discovery conferences or hearings on motions to compel discovery (Dkt. Nos. 129, 134, 138, 151, 182, 223, 231, 248, 257, 274), resulting in five orders requiring Defendants to comply with their discovery obligations (Dkt. Nos. 152, 216, 239, 247, 256).  The many briefing schedules, discovery conferences, and hearings motivated by Defendants' discovery misconduct have "consumed some of the court's time that could have been devoted to other cases on the docket." *Id.*

### c.    **Prejudice**

The prejudice inquiry "looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959.  This factor weighs in favor of dismissal where a party's "[d]isregard of the discovery process deprived the [other party] of needed information, increased its litigation expenses, and forestalled its preparation for trial." *Chism v. Nat'l Heritage Life Ins. Co.*, 637 F.2d 1328, 1331 (9th Cir. 1981), o*verruled on other grounds by Bryant v. Ford Motor Co.*, 832 F.2d 1080 (9th Cir. 1987).  A "failure to produce documents as ordered . . . is considered sufficient prejudice." *Payne*, 121 F.3d at 508.

As the Court discussed above in its willfulness inquiry, the documents that Defendants withheld are related to the merits of the case.  Instead of producing these documents in response to Plaintiff's RFPs in late 2023 (*see* Dkt. No. 129), Defendants withheld at least tens of thousands of documents; deleted files they knew were potentially relevant to the case and were well within the scope of multiple court orders; and obstructed the court-ordered forensic examination by, among other things, wiping their iPhones and providing other devices to an unnamed third party in Thailand without informing the examiner. *See supra* Section III-vii.  Even now, almost 18 months after the first discovery conference in this matter, the Court has no confidence that Plaintiff has the documents it needs to prepare for trial dur to Defendants' discovery-related misconduct.  *See* Thankachan Decl. Nov. 4, 2024 ¶¶ 6(a)-(c) (listing examples of "why the full impact of Defendants' misconduct remains essentially incalculable").  Defendants' misconduct has deprived Plaintiff of needed information, increased Plaintiff's litigation expenses, and impaired Plaintiff's trial preparation and warrants the imposition of terminating sanctions. *Chism*, 637 F.2d at 1331.

Nor does Defendants' argument—relying almost exclusively on language from cases in the Southern District of New York—show that their subsequent production of deleted messages necessitates a less drastic sanction.  Post-Hearing Sanctions Opp'n at 4-

6.  On the contrary, "[b]elated compliance with discovery orders does not preclude the imposition of sanctions." *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986).  The "last-minute tender of documents," such as those allegedly produced right before an evidentiary hearing that occurred a full year after the Court's first order requiring Defendants to produce them, "does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts." *Id.* As the Ninth Circuit has advised, the prejudice inquiry "is not whether [plaintiff] eventually obtained the information that they needed, or whether [defendants] are now willing to provide it, but whether [defendants'] repeated failure to provide documents and information in a timely fashion prejudiced the ability of [plaintiff] to prepare their case for trial." P*ayne*, 121 F.3d at 508.  Because that is the case here, this factor favors dismissal.

### d.    Policy favoring disposition on the merits

Although this factor almost always cuts against terminating sanctions, it alone "is not sufficient to outweigh the other four factors." *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 133 n. 2 (9th Cir. 1987).  This factor lends particularly "little support to a party whose responsibility it is to move a case toward disposition on the merits but whose conduct impedes progress in that direction." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1228 (9th Cir. 2006).  Such is the case here.

### e.    Availability of lesser sanctions

Courts must consider whether a lesser sanction could adequately address a party's misconduct.  *Malone*, 833 F.2d at 131.  Reviewing courts consider whether the district court (1) imposed alternative sanctions prior to ordering dismissal, (2) warned the party that dismissal was a potential sanction prior to ordering the same, or (3) discussed less severe sanctions.  *Anheuser-Busch*, 69 F.3d at 352.

/ / /

/ / /

/ / /

/ / /

First and second, although it "is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning," *Valley Eng'rs Inc.*, 158 F.3d at 1057[4], the Court did both before getting to this point.

On May 24, 2024, Plaintiff filed a motion for default judgment against Defendant Twins USA. Dkt. No. 194. Defendant opposed. Dkt. No. 205. Judge Ohta held a hearing on July 10, 2024, and set an order to show cause hearing as to why monetary sanctions should not issue. Dkt. No. 214. After reviewing briefing and holding the order to show cause hearing, Judge Ohta issued monetary sanctions against Defendant Twins USA in the amount of $29,878.85. Dkt. No. 232 at 1-2. Defendant was "permitted to make this payment in six monthly installments as set forth on the record." *Id.* at 2.

Plaintiff again filed a motion to dismiss and for entry of default against Twins USA on September 5, 2024. Dkt. No. 240 at 1. The Court held oral argument on the motion and ordered Defendant to pay Plaintiff the second installment owed under the Court's previous sanctions order by September 19, 2024. Dkt. No. 250 at 1-2. About a week later, Plaintiff filed a motion for contempt against Defendants for failing to timely pay the second installment of monetary sanctions. Dkt. No. 252. Judge Ohta ordered Defendants to comply with the Court's previously set installment plan: Defendants "MUST furnish the second payment as soon as possible, as it is already past due, and Defendants MUST also pay the third installment on or before October 14, 2024. Should Defendants continue to not comply with this Court's orders, Defendants should be prepared to discuss alternative forms of sanctions, such as dismissal."[5] Dkt. No. 254.

---

[4]     *See also In re Fitzsimmons*, 920 F.2d 1468, 1474 (9th Cir. 1990) ("[B]ecause bad faith behavior poses such a serious threat to the authority of a district court, the existence of bad faith constitutes egregious circumstances which can warrant dismissal even without the explicit consideration of alternative sanctions.")

[5]     Defendants proffered that they paid the entirety of the monetary sanctions in late January or early February 2025, at least three months after the Court-imposed deadline. Dkt. No. 319 at 3. According to a declaration filed by counsel for Plaintiff, though,

And a month after that, at the October 17, 2024 contempt hearing, Judge Ohta observed:

> So, there have been a series of delays caused by Twins USA and the Mechling brothers' conduct of this case. There have also been a series of violations of the Court's orders and what seems to be a pick-and-choose approach to deciding if and when they are going to comply with the Court's orders—not when the Court orders it, but when either the Mechling brothers find it convenient or just in the nick of time right before a court hearing. All of this conduct is making . . . this litigation very costly and dilatory for Twins Thailand and is also imposing great costs for them to keep having to bring a motion for sanctions and motions for default judgment . . . . And all of the behaviors since then [have] followed that same pattern. It should not require three court orders for Twins USA and the Mechling brothers to just barely . . . stave off further sanctions. This selective and strategic decision of if and when they're going to comply with court orders as opposed to treating it as something that they—it is absolutely necessary, to do.

Dkt. No. 286 at 8:7-9:4. In the Ninth Circuit, "a judge's warning to a party that a future failure to obey a court order will result in default judgment can itself suffice to meet the consideration of alternatives requirement." *Estrada v. Speno & Cohen*, 244 F.3d 1050, 1057 (9th Cir. 2001). Judge Ohta's explicit warning at Dkt. No. 254, and her admonishment at the contempt hearing, provided ample warning to Defendants.

Third, the Court has considered alternative monetary, evidentiary, and issue preclusion sanctions, and concludes that even broad sanctions would not adequately redress Defendants' egregious misconduct. Defense counsel suggested that if the Court were inclined to issue sanctions, those sanctions should take the form of paying the cost of the forensic examination and "a document sanction in that the Mechlings should not be able to utilize any document not previously produced." Dec. 11 Hearing Trans. at 40:5-16. But as discussed above, Defendants' "willful failure to pay" their previous monetary sanctions

---

Defendants are still "in arrears . . . to Plaintiff for missed sanctions payments," and at least one scheduled sanctions payment remains outstanding. Dkt. No. 323-1 ¶¶ 3-5 ("Seror Decl. Feb. 3, 2025").

"without credible explanation underscores [the] inefficacy" of monetary sanctions. *Payne*, 121 F.3d at 508 (citing *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1033 (5th Cir. 1990)). Taking Defendants at their word that they paid "the final sanction payment due to the plaintiff" in late January or early February (Dkt. No. 319 at 3), they were still at least three months late in rendering that payment. The more concerning issue, though, and the reason that a lesser sanction would be inadequate, is that Defendants' "pattern of deception and discovery abuse [make] it impossible for the district court to conduct trial with any reasonable assurance that the truth would be available." *Conn. Gen. Life. Ins. Co.*, 482 F.3d at 1097.

The examiner concluded "Defendants' obstruction of the forensic inspection creates serious evidentiary gaps that do not permit [him] to definitively state the full impact of Defendants' apparent noncompliance." Thankachan Decl. Nov. 4, 2024 ¶ 4. The examiner also concluded Defendants continue to withhold not only documents that forensic data indicates they possessed—such as financial data including QuickBooks files and encrypted messages using the Signal app—but also entire devices. *Id.* ¶ 4(c) (QuickBooks files); *Id.* ¶ 6(a) and Dec. 10 Hearing Trans. at 74:3-75:17 (encrypted messages); Thankachan Decl. Nov. 4, 2024 ¶ 4(d) (withheld device(s)). Beyond withholding the data and devices, the records demonstrates that the Mechlings lacked candor with the examiner. Dec. 10 Hearing Trans. at 30:12-31 (Nicholas Mechling's "representations to the forensic team about how long those [iPhones] were in use by him and his brother . . . were false and/or misleading."); Thankachan Decl. Nov. 4, 2024 ¶ 6(a) (Although Defendants told Jerry Bui during a September 30, 2024 interview that they did not use encrypted channels to communicate, the forensic examination revealed "iMessages that specifically reference shifting certain discussions from unencrypted iMessages to Signal."). And finally, although the Mechlings argue they have "literally provided everything, from every possible device," they provided multiple hard drives to an unnamed third party in Thailand that they unilaterally decided would usurp the role of the Court-ordered forensic examiner, and that they chose to keep secret from the Court and Plaintiff until the December 10 hearing. Dec.

11 Hearing Trans. at 43:3-15. This behavior demonstrates that Defendants "do not take [their] oath to tell the truth seriously," and that they "will say anything at any time in order to prevail in this litigation." *Anheuser-Busch*, 69 F.3d at 352. As the Ninth Circuit has repeatedly stated, "[t]here is no point to a lawsuit, if it merely applies law to lies. True facts must be the foundation for any just result." *Valley Eng'rs Inc.*, 158 F.3d at 1058; *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097 (same). Because Defendants' discovery misconduct has prevented the Court from proceeding with "any reasonable assurance that the truth would be available," less severe sanctions are not appropriate. *Conn. Gen. Life. Ins. Co.*, 482 F.3d at 1097.

## B.    Terminating Sanctions under Rule 37(e)

Parties trigger Rule 37(e) when they "fail to take reasonable steps to preserve" ESI that "should have been preserved in anticipation or conduct of litigation," and when such information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). For terminating sanctions to issue, the Court must also find "that the party acted with the intent to deprive another party of the [lost] information's use in the litigation." Fed. R. Civ. P. 37(e)(2). These elements are present here.

### 1.    Rule 37(e) Prerequisites

First, the ESI at issue "should have been preserved in anticipation or conduct of litigation." Defendants wiped their iPhones and deleted files from other devices before turning them over to the examiner while the litigation was ongoing. Second, not only did Defendants "fail to take reasonable steps to preserve ESI," but they actively chose to delete ESI that should have been subject to the forensic examination. And third, the ESI "cannot be restored or replaced through additional discovery."

Defendants argue this last element is not met because they "have produced all possibly relevant documents to plaintiff" and because they "re-uploaded what [they] determined was potentially responsive data to the devices which were produced . . . confirming that no data was destroyed." Post-Hearing Sanctions Opp'n at 3-5. Their argument fails for three reasons. First, Plaintiff has put forth evidence that ESI that should

exist has been lost. Forensic data indicates Defendants had QuickBooks files and encrypted Signal messages on their devices, but these documents have never been produced, despite testimony by Defendants that they had turned over all files. Thankachan Decl. Nov. 4, 2024 ¶ 4(c), 6(a). This means either that additional discovery into these two categories of documents would be futile, or that these two categories of documents have been irretrievably lost. Either conclusion satisfies the Rule 37(e) requirement. The Court acknowledges that Defendants provided about 31,000 deleted documents to the examiner after their misconduct came to light. Thankachan Decl. Nov. 4, 2024 ¶ 4(c); Dec. 10 Hearing Trans. at 26:1-27:20. But "production of some evidence does not excuse destruction of other relevant evidence." *Riot Hosp. Grp. LLC*, 95 F.4th at 736. Second, Defendants' argument "implies that litigants can play an endless shell game," not deleting data but moving it "to somewhere else in the cloud or somewhere else on . . . various computers" and being immune from any consequences. *Keating v. Jastremski*, No. 3:15-CV-00057-L-AGS, 2020 WL 1809139, at *13 (S.D. Cal. Apr. 9, 2020). And third, although the Mechlings assert they re-uploaded all relevant files, the examiner cannot conclude whether this is the case because the Mechlings failed to cooperate and turn over all their devices. Dec. 10 Hearing Trans. at 91:8-22 (examiner made efforts to get on a call with Mechlings to discuss the wipes, but Mechlings were nonresponsive). Without all the devices, there is no way for the examiner to compare the data that existed on the iPhones before they were wiped and the data that existed after they were wiped. *Id.* at 96:7-21; *see also Riot Hosp. Grp. LLC*, 95 F.4th at 736 (affirming district court's imposition of Rule 37(e) sanctions where spoliating parties "obtained new phones shortly after they were ordered to hand over their devices for imaging," but then failed to produce the earlier phones, "effectively preventing discovery of messages deleted from those phones"). Put another way, the Court has no adequate assurance that Defendants have produced all relevant documents given their discovery misconduct in this case and the conclusions of the examiner. Accordingly, the Court finds by a preponderance of the evidence that ESI

deleted by Defendants cannot be restored or replaced through additional discovery. Because the Rule 37(e) prerequisites are met, the Court turns next to intent.

### 2. **Intent**

Defendants acted with the intent required for Rule 37(e)(2) sanctions by deleting at least two sources of evidence. First, the Mechlings wiped their respective iPhones just days after the Court ordered that they were to turn the devices over to the forensic examiner. Thankachan Decl. Nov. 4, 2024 ¶ 4(b); Dec. 10 Hearing Trans. at 30:12-31. As discussed above, this means that the Mechlings removed all the data on their devices and replaced the deleted data with data that they elected to place on the reset devices. Thankachan Decl. Nov. 4, 2024 ¶¶ 4(a)-(b). Second, Defendants deleted certain files and documents from other devices before turning them over to the examiner. Dkt. No. 266-1. This data "include[s] spreadsheets which refer both to their individual finances and the finances of Twins Special LLC," despite previous Court orders requiring Defendants to produce exactly this type of information. *Id.*

Terminating sanctions are warranted under Rule 37(e)(2) where a party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The "intent required by Rule 37(e)(2) is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Gregory v. Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024). "Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions. Relevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation." *Jones*, 95 F.4th at 735.

Here, Plaintiffs have established by a preponderance of the evidence that Defendants spoliated evidence to avoid its discovery by Plaintiff. On September 14, 2024, a little over a week after the Court issued the forensic examination order requiring Defendants to begin turning over their devices, Nicholas Mechling decided to reset and wipe his iPhone. Thankachan Decl. Nov. 4, 2024 ¶ 4. Then, on September 24, 2024, one day after the Court

ordered the Mechlings to bring their electronic devices to San Diego to conduct the forensic examination in person, Christopher Mechling decided to reset and wipe his iPhone. *Id.* The timing of the destruction is consistent with an intent to deprive. *See RG Abrams Ins. V. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 508 (C.D. Cal. 2022) (finding intent to deprive where individual traded in cell phone shortly after being served with discovery specifically seeking the text messages contained therein).

Furthermore, Defendants selectively preserved documents. Nicholas Mechling "re-uploaded what *he determined* was potentially responsive data" to the iPhones after wiping them. Post Hearing Sanctions Opp'n at 3. And the letter from Defense counsel to Plaintiff's counsel admitted "*certain* files were apparently deleted from the devices produced on September 30, 2024, to protect, in their minds, the Mechlings' individual rights of privacy." Dkt. No. 266-1. This pick-and-choose approach employed by Defendants as to which documents would be accessible during discovery is further circumstantial evidence that they spoliated data with the intent to hide those documents from Plaintiff. *See Armstrong v. Holmes*, No. 322CV00375ARTCSD, 2024 WL 1345214, at *4 (D. Nev. Mar. 29, 2024) ("She kept the messages that *she* thought were important to the case, but deleted the others. This is indicative of intent under Rule 37(e)(2).") (emphasis in original).

Defendants argue they wiped their iPhones only because they were fearful of what may happen if their location data became available, and that they deleted files from other devices before the forensic examination only to protect their "individual rights of privacy." Sanctions Opp'n at 3. But a party's desire to "protect his privacy" by deleting certain "personal" files does not negate a finding of willfulness. *Leon*, 464 F.3d at 959. In *Leon*, the Ninth Circuit held that the plaintiff's "behavior amounted to willful spoliation because he knew he was under a duty to preserve all data on the laptop, but intentionally deleted many files." *Id.* The court explicitly rejected the plaintiff's argument that his actions did not constitute willfulness because, although he destroyed the information, "his intent was merely to protect his privacy," as many of the deleted files were "pornographic" or

otherwise "personal." *Id.* The facts here present an even stronger case for terminating sanctions, where Defendants deleted financial data from their devices prior to providing the devices to the examiner. Dkt. No. 266-1. Although Nicholas Mechling testified that all such financial documents were later recovered and produced to Plaintiff, that representation carries little weight in light of Defendants' pattern of failing to produce responsive documents. In sum, the Court finds Defendants acted with the requisite intent to deprive.

## C. <u>Monetary Sanctions</u>

Rule 37(b)(2)(C) provides that with respect to payment of expenses for failure to comply with a court order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). The causal connection required to order fees "is appropriately framed as a but-for test: [t]he complaining party . . . may recover only the portion of his fees that he would not have paid but for the misconduct." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 109 (2017). As described above, Defendants were not substantially justified in their non-compliance with multiple court orders, and certain of the requested attorneys' fees would not have been incurred but for Defendants' noncompliance with Court orders. Therefore, the imposition of monetary sanctions is mandatory.

Plaintiff requests an award of $571,693.14 in monetary sanctions comprised of attorneys' fees and costs as follows: (1) $370,808.16 in attorneys' fees; (2) $186,078.83 in forensic examination costs; and (3) $14,806.15 in costs for court reporters at depositions (not including the costs of depositions of Plaintiff) and transcript orders for discovery-related hearings. Dkt. No. 321-1 ¶¶ 3-22 ("Bhandari Decl. Jan. 31, 2025"). Plaintiff contends Defendants "have never contested any aspect of [Plaintiff's] proof of fees and costs," instead focusing "their opposition on whether misconduct had been proven, not on resulting costs." *Id.* ¶ 2.

Defendants argue the monetary sanctions sought by Plaintiff are unreasonable. Sanctions Opp'n at 4. Although "some monetary sanction may be appropriate, any monetary sanction awarded must be measured" and should "consider the degree to which any delay in production or other impropriety [has] any realistic impact upon the determination of the case on its merits." *Id.* Defendants also argue the examiner's costs are "highly questionable given the speed at which AI can search documents." *Id.* at 9.

As set forth below, the Court **RECOMMENDS** that Defendants be ordered to pay monetary sanctions totaling $435,614.31, representing the full amount of attorneys' fees, the full amount of costs for court reporters and transcript orders, and the examiner's costs to the extent they would not have been incurred but for Defendants' noncompliance with the forensic examination order.

### 1. Attorneys' Fees

An award of attorneys' fees must be reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "Federal courts employ the lodestar method to determine a reasonable attorney's fees award . . . ." *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016). This is a "two-step process." *Id.* "First, a court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Id.* "Second, the court determines whether to modify the lodestar figure, upward or downward, based on factors not subsumed in the lodestar figure." *Id.*

"Fee applicants have the burden of producing evidence that their requested fees are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110 (9th Cir. 2014). "[T]he relevant community is the forum in which the district court sits." *Id.* "Affidavits of the plaintiffs' attorneys and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate." *Id.* "Once a fee applicant presents such evidence, the opposing party has a burden of rebuttal that requires submission of evidence . . . challenging the accuracy and

reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." *Id.* at 1110-11.

Beyond affidavits, "the court may rely on its own familiarity with the legal market to determine the reasonable rates of [counsel]." *Fitzgerald v. Pollard*, No. 20CV848 JM(MSB), 2024 WL 4596401, at *11 (S.D. Cal. Oct. 28, 2024). Courts in this District "have awarded hourly rates for work performed in civil cases by attorneys with significant experience anywhere in the range of $550 per hour to more than $1000 per hour." *Soler v. Cnty. of San Diego*, No. 14cv2470-MMA (RBB), 2021 WL 2515236, at *5 (S.D. Cal. June 18, 2021) (collecting cases); *see also Flowrider Surf, Ltd. v. Pac. Surf Designs, Inc.*, No. 15CV1879-BEN (BLM), 2017 WL 2212029, at *3 (S.D. Cal. May 18, 2017) (finding hourly rates of $750 for an intellectual property partner with 25 years of experience, $550 for an intellectual property associate with 10 years of experience, $350 for an intellectual property associate with 4 years of experience, and $150 for an intellectual property paraprofessional with 19 years of experience reasonable).

Plaintiff submits a declaration from its counsel, Sanjay Bhandari, describing the qualifications and experience of each attorney and paralegal who worked on this matter and stating that their hourly rates are reasonable, within the range of rates charged by similarly qualified and experienced attorneys, and both stipulated to by Defendants and approved by Judge Ohta when she previously imposed monetary sanctions on Defendants. Bhandari Decl. Nov. 4, 2024 ¶ 3. Those rates are[6]:

| Name | Position | Hourly Rate |
| --- | --- | --- |
| Sanjay Bhandari | Shareholder | $715.00 |
| William Miller | Shareholder | $600.00 |

---

[6] Although the hourly rates for certain attorneys has increased over the years, Plaintiff's counsel applies "the original (lower) hourly rate for any timekeeper whose rate increased during the relevant period." Bhandari Decl. Nov. 4, 2024 ¶ 3. Additionally, Mr. Bhandari represents he "sometimes reduce[s] the hours billed and did so with respect to some of the work covered by this declaration." *Id.* ¶ 4.

| Name | Position | Hourly Rate |
|------|----------|-------------|
| Matthew Seror | Shareholder | $535.49 |
| Emily Chaidez | Senior Counsel | $342.66 |
| Neusha Etemad | Associate | $301.08 |
| Taylor King | Associate | $285.00 |
| Sheila Grela | Paralegal | $189.29 |

Considering the experience of Plaintiff's counsel and the hourly rates approved in the Southern District of California, the Court concludes the hourly rates of Plaintiff's counsel are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Chaudhry*, 751 F.3d at 1110. The Court concludes similarly as to the hourly rates of Plaintiff's counsel's paralegal. *See Fitzgerald*, 2024 WL 4596401, at *12 ("Generally, reasonable rates for paralegals in this district have ranged from $125 to $250," and collecting cases). Accordingly, the Court will utilize the rates in the table above in the lodestar analysis.

In addition to establishing the claimed hourly rates are reasonable, fee applicants also must document "the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992). The fee award "may be based on the affidavits of counsel, so long as they are sufficiently detailed to enable the court to consider all the factors necessary in setting the fees." *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 946 (9th Cir. 1993). "The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates*, 987 F.2d at 1397-98.

The Court finds Plaintiff's counsel has submitted "sufficiently detailed" affidavits as to the number of hours worked through the submission of the Sanctions Motion (Bhandari Decl. Nov. 4, 2024 ¶¶ 4-20), and the number of hours worked between the

submission of the Sanctions Motion and the submission of the Post-Hearing Sanctions Motion (Bhandari Decl. Jan. 31, 2025 ¶¶ 2-16). Plaintiff's counsel's affidavits "disclose[] the nature of the services rendered in connection with unavailing efforts to obtain discovery, the amount of attorney time so consumed, and the rates at which this time was billed to the client." *Gill Indus.*, 983 F.2d at 946; *accord Sablan v. Dep't of Fin. of Com. of N. Mariana Islands*, 856 F.2d 1317, 1322 (9th Cir. 1988) (affidavits with similar levels of information were "sufficiently detailed to provide an adequate basis for calculating the award"). Defendants' conclusory argument that awards of fees must "consider the degree to which any delay in production or other impropriety" impacts the "determination of the case on its merits" is unsupported by any evidence and is insufficient to meet their burden of rebuttal. Therefore, the Court **RECOMMENDS** awarding Plaintiff $370,808.16 in attorneys' fees.

### 2. Costs

Plaintiff seeks $14,806.15 in costs for court reporters and transcripts for discovery-related hearings and depositions, and $186,078.83 in forensic examination costs. Bhandari Decl. Jan. 31, 2025 ¶¶ 3-22. Defendants challenge the reasonableness of the examination costs "given the speed at which AI can search documents." Sanctions Opp'n at 9.

A monetary award to a prevailing party "can include reimbursement for out-of-pocket expenses including . . . travel, courier and copying costs." *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 580 (9th Cir. 2010); *see also Youngevity Int'l v. Smith*, No. 3:16-CV-704-BTM-JLB, 2021 WL 2559456, at *4 (S.D. Cal. May 19, 2021) ("An award of attorneys' fees under Rule 37 properly includes out-of-pocket expenses including mailing, copying, and travel.").

The Court **RECOMMENDS** awarding Plaintiff's unopposed request for $14,806.15 in costs for court reporters and transcript orders. *See* Bhandari Decl. Nov. 4, 2024 ¶ 21 (detailing costs breakdown); Bhandari Decl. Jan. 31, 2025 ¶ 17 (same).

The Court **RECOMMENDS** a reduced award of $50,000 to Plaintiff for costs arising from the forensic examination. The parties stipulated to the procedures for the

forensic examination before the Court made any finding that Defendants had violated a Court order.  Dkt. No. 234.  Therefore, the examiner's costs in reviewing the Mechlings' devices and documents would have been incurred regardless of Defendants' noncompliance with discovery orders.  Plaintiff should still recover, though, for the examiner's costs of working around Defendants' obstruction of the Forensic Examination Order itself.

These costs include the "dozens of emails and calls to the Mechlings to obtain information . . . because they did not provide disclosure forms or turn over devices as requested;" the work required "to identify additional devices, channels of communication, and other potential misconduct due to . . . the Mechlings' noncooperation;" the "need to follow up with the Mechlings regarding further upload of data or the disclosure of additional devices;" and the increased time and resources devoted to data recovery because the Mechlings deleted data from their iPhones and computers before turning them over to the examiner.  Thankachan Decl. Nov. 4, 2024 ¶ 4(a).  In November, a "conservative estimate" of these costs was $40,000.  *Id.*

These costs should not include the review of documents that were not previously produced by the Mechlings.  In November, the examiner estimated this to be "well over $100,000," as "the industry average cost for such review is about $1.25 to $1.50 per document," and there were hundreds of thousands of potentially responsive documents that would have to be reviewed.  *Id.*  Although the examiner stated "myriad forms of misconduct" by the Mechlings "account for all or nearly all" of the examiner's costs, Thankachan Decl. Jan. 31, 2025 ¶¶ 4-6, Plaintiff would have borne the cost of reviewing any documents uncovered by the forensic examination that were not previously produced anyway.  Finding documents "relevant to this proceeding that have not been previously produced" was, after all, the "purpose of the Examiner's work."  Dkt. No. 234 at 2.

 The "essential goal in shifting fees is to do rough justice, not to achieve auditing perfection."  *Goodyear*, 581 U.S. at 110; *see also In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899, 935 (N.D. Cal. 2023) (trying to achieve rough

23-cv-223-JES-DDL

justice in awarding costs as well as attorneys' fees); *Hodgson v. Roper*, No. 2:20-CV-00650-KJM-DB, 2023 WL 1824199, at *3 (E.D. Cal. Jan. 20, 2023) (same).  Because the examiner's costs increased as his team performed more work between November and January, some upward shift should likewise apply to the $40,000 attributable to Defendants' noncompliance with the forensic examination order.  From November to January, the examiner's costs increased roughly 80 percent, from about $100,000 to about $180,000.  But "the majority of [the examiner's] costs arose from basic gathering and processing of responsive documents called for by discovery requests."  Thankachan Decl. Jan. 31, 2025 ¶ 3.  Therefore, the Court recommends applying a 25% increase to the $40,000, bringing the total recoverable forensic examination costs to $50,000.

## V.

## <u>CONCLUSION</u>

Based on the above, the undersigned concludes Defendants' discovery misconduct was willful and related to the merits, and that the *Anheuser-Busch* factors weigh in favor of terminating sanctions.  The undersigned concludes Defendants' noncompliance with Court orders was not substantially justified, and that Plaintiff would not have incurred most of the fees and costs at issue but for Defendants' noncompliance.  The undersigned accordingly **RECOMMENDS** the District Court issue an Order: (1) approving and adopting this Report and Recommendation in its entirety; (2) granting Plaintiff's motion for terminating sanctions; and (3) granting in part Plaintiff's motion for monetary sanctions in the amount of $435.614.31.

The undersigned further **RECOMMENDS** the District Court **DENY AS MOOT** Plaintiff's motion for contempt.  Dkt. No. 249.  In light of the recommendation for both terminating sanctions and monetary sanctions, "the compulsory powers of civil contempt to compel compliance with the underlying discovery orders [are] no longer necessary." *United States v. Campbell*, No. 2:11-CV-2826-MCE-EFB, 2012 WL 5949118, at *4 (E.D. Cal. Nov. 28, 2012).

/ / /

Finally, the undersigned **RECOMMENDS** the District Court **DENY AS MOOT** Plaintiff's motion for sanctions against Defense counsel under 28 U.S.C. § 1927. Dkt. No. 322. As Plaintiff notes, Defendants' actions have several times put counsel in "very difficult position[s]." Dkt. No. 322 at 5. The Court notes similarly. *See* Dec. 11 Hearing Trans. at 42:21-23 (The Court: "It's not about you and what you have urged your clients to do. It is candidly about what they have done and what they [have] not done."). Mr. Morris has recognized that his duties to the Court override his clients' requests to act contrary to Court orders, "commendably informing Mr. Bhandari that [Defendants] had unilaterally deleted other evidence from the devices before they were turned over" and urging Defendants to provide that information. *Id.* at 30:9-12. Plaintiff requests Defense counsel be sanctioned "as a deterrent against inevitable future requests by Defendants to override counsel's duties." Dkt. No. 322 at 5. The imposition of terminating and monetary sanctions will achieve this same outcome.

**IT IS HEREBY ORDERED** that any objections to this Report and Recommendation must be filed by not later than **May 19, 2025**. Any response to a party's objections must be filed by not later than **May 26, 2025**. Failure to timely file objections may waive the right to raise those objections on appeal. *See Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

**IT IS SO ORDERED.**

Dated: May 5, 2025

_David Leshner_
_____
Hon. David D. Leshner
United States Magistrate Judge

23-cv-223-JES-DDL